UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VANESSA PEAKE,

    Plaintiff,                                          Civil Action No. 19-CV-13476

vs.                                                 HON. BERNARD A. FRIEDMAN

MARADA INDUSTRIES, INC d/b/a
COSMA BODY ASSEMBLY MICHIGAN,

    Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is presently before the Court on defendant's motion for summary judgment (ECF No. 17). Plaintiff has responded and defendant has replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing. For the reasons stated below, the Court shall grant the motion in part and deny it in part.

This is an employment discrimination case. Plaintiff worked for defendant as its Health, Safety, Ergonomics & Environmental Coordinator at its New Hudson, Michigan, manufacturing facility from April 11, 2016, until she was discharged on November 17, 2017. *See* Compl. ¶¶ 13, 31. Defendant contends that it discharged plaintiff for poor performance. Plaintiff contends that she was discharged, among other reasons, because she requested accommodations for her post-traumatic stress disorder ("PTSD") and because she reported to management and the company hotline instances of race discrimination that she observed against African-American employees. Plaintiff asserts claims for discrimination and/or failure to accommodate her disability under the Americans with Disabilities Act ("ADA") (Count I); retaliation for exercising her rights under the ADA (Count II); discrimination and/or failure to accommodate under Michigan's Persons

With Disabilities Civil Rights Act ("PWDCRA") (Count III); race discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count IV); retaliation for reporting race discrimination in violation of Title VII (Count V); race discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") (Count VI); retaliation for reporting race discrimination in violation of the ELCRA (Count VII); and retaliation in violation of Michigan Workers' Disability Compensation Act ("WDCA") (Count VIII). For relief, plaintiff seeks damages, costs, interest, and attorney fees.

Defendant seeks summary judgment on all of plaintiff's claims. In deciding this motion, the Court

> must view the evidence in the light most favorable to the party opposing the motion for summary judgment. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020). "This includes drawing 'all justifiable inferences' in the nonmoving party's favor." *George*, 966 F.3d at 458 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Jackson-VHS*, 814 F.3d at 775 (quoting *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505).

*Strickland v. City of Detroit*, 995 F.3d 495, 503 (6th Cir. 2021).

***Collateral Estoppel***

Defendant first argues that plaintiff's state-law claims are barred by the doctrine of collateral estoppel because a state Administrative Law Judge ("ALJ") made a finding that plaintiff was discharged for poor performance, not in retaliation for raising safety issues with the company.[1] A copy of the ALJ's decision is attached to defendant's reply brief as Exhibit D. In that

---

[1] Defendant does not argue that the ALJ's decision collaterally estops plaintiff from pursuing her Title VII or ADA claims.

administrative proceeding, plaintiff alleged that she was terminated because she "rais[ed] concerns about forklift drivers," although she never filed a formal complaint with the Michigan Occupational Safety and Health Administration ("MIOSHA"). ALJ Decision at 6 (PageID.633). The ALJ found that plaintiff had engaged in activity protected by the Michigan Occupational Safety and Health Act by reporting her safety concerns, and that defendant was aware that she had done so. *Id.* at 14-15 (PageID.641-42). However, the ALJ also found that plaintiff failed to show a causal connection between her protected activity and her termination, stating: "There is no evidence that the decision to terminate [plaintiff] was based on her reporting of safety concerns. Mr. Myers' testimony that he terminated [plaintiff] for poor job performance is credible and is adopted. *Id.* at 15 (PageID.642). Plaintiff did not appeal the ALJ's decision. *See* Pl.'s Dep. at 168.

A decision reached in an administrative proceeding can be binding on the parties in a subsequent judicial proceeding. As the Michigan Court of Appeals has stated, "[t]he preclusion doctrines [of res judicata and collateral estoppel] are applicable to administrative decisions (1) that are 'adjudicatory in nature,' (2) when a method of appeal is provided, and (3) when it is clear that the Legislature 'intended to make the decision final absent an appeal.'" *William Beaumont Hosp. v. Wass*, 889 N.W.2d 745, 750 (Mich. Ct. App. 2016) (quoting *Nummer v. Treasury Dep't*, 533 N.W.2d 250, 253 (Mich. 1995)). If these prerequisites are met, collateral estoppel will preclude the relitigation of an agency's factual findings if "three elements [are] satisfied: (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel." *Wass*, 889 N.W.2d at 750 (quoting *Monat v. State Farm Ins. Co.*, 677 N.W.2d 843, 845-46 (Mich. 2004)).

3

Defendant argues that plaintiff is bound by the ALJ's finding that defendant discharged her for poor performance. The Court rejects this argument because the first and second elements of the test articulated in *Wass* are not met. First, this finding was not "a question of fact essential to the judgment." The sole issue before the ALJ was whether plaintiff had established, by a preponderance of the evidence, that defendant discharged her in retaliation for engaging in activity protected by the state's Occupational Safety and Health Act.[2] As noted, the protected activity at issue in that proceeding consisted of plaintiff voicing concerns over plant safety, particularly regarding forklifts. The only questions of fact that were essential to the ALJ's judgment were (1) whether plaintiff engaged in protected activity, (2) whether defendant was aware of that activity, (3) whether plaintiff suffered an adverse employment action, and (4) whether a causal connection existed between the protected activity and the adverse action. The limited nature of the inquiry is apparent from the statute under which the ALJ was proceeding, which states that "[a] person shall not discharge an employee . . . because the employee filed a complaint . . . under or regulated by this act . . . or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act." Mich. Comp. Laws § 408.1065(1). Once the ALJ found that "[t]here is no evidence that the decision to terminate [plaintiff] was based on her reporting of safety concerns," ALJ Decision at 15 (PageID.642), his statutory fact-finding duties were concluded. The ALJ's additional finding that defendant terminated her "for poor job performance" was dictum and

---

[2] As the ALJ noted, "[t]he purpose of this review is to examine a determination by the Michigan Occupational Safety and Health Employee Discrimination Section . . . that [defendant] did not terminate [plaintiff] in retaliation for filing a MIOSHA safety complaint." ALJ Decision at 1 (PageID.628). The ALJ correctly indicated that the only issues before him were whether defendant discriminated against plaintiff "because of her protected activity in violation of Section 65 of MIOSHA" and whether the agency's determination should "be affirmed, reversed, or modified." ALJ Decision at 2 (PageID.629).

4

unnecessary (i.e., not essential) to the judgment.

Second, plaintiff did not have a full and fair opportunity in the MIOSHA proceeding to litigate the reasons for her discharge. In that proceeding, plaintiff could offer only one unlawful reason for her discharge, namely, that she had reported safety concerns. She had no opportunity to argue that, and the ALJ had no reason to determine whether, defendant discharged her because of her race, or because she reported racial discrimination against other employees, or because she has a disability, or because she requested an accommodation. It would be entirely inappropriate and unfair to bind plaintiff in the instant case to the ALJ's "poor job performance" finding and thereby prevent her from arguing that other reasons explain defendant's termination decision. Accordingly, the ALJ's "poor job performance" finding is not entitled to collateral estoppel effect in the instant case.

***ADA and PWDCRA Claims***

Defendant next argues that plaintiff's failure-to-accommodate claim under the ADA fails "because Defendant ***granted*** Plaintiff's requested reasonable accommodation."[3] Def.'s Summ. J. Br. at 11 (emphasis in original). When plaintiff returned to work at the end of September 2017 after a month-long leave of absence, her psychotherapist notified defendant's human resources manager, Shelly Thompson, that she needed the following accommodations:

> A. When Ms. Peake is overwhelmed and cannot manage her emotions and feelings, please allow her frequent breaks in the work-place. These breaks should not exceed 30 minutes. This will give Ms. Peake time to re-group and return to the task at hand.

---

[3] The Court's analysis under the ADA applies equally to plaintiff's claims under the PWDCRA. As defendant notes, the ADA and the PWDCRA "substantially mirror each other." Def.'s Summ. J. Br. at 10 n.8 (quoting *Chavez v. Waterford Sch. Dist.*, 720 F. Supp. 2d 845, 854 (E.D. Mich. 2010)).

5

> B. When Ms. Peake is faced with challenges by other mid-level management team members, please allow her time to take a break to re-group and process the information she is given and then respond to the request that is made of her. These breaks should not exceed 30 minutes. This will give Ms. Peake time to re-group and return to the task at hand.

Pl.'s Ex. 8 (PageID.466).

Defendant acknowledges that "employers must make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability' . . . unless the accommodation would 'impose an undue hardship.'" Def.'s Summ. J. Br. at 10 (quoting 42 U.S.C. § 12112(b)(5)(A)). Defendant does not suggest that the accommodation plaintiff requested would impose an undue hardship. Rather, as noted, defendant states that it agreed to make the accommodation. Yet plaintiff testified that when she attempted to make use of the accommodation, her supervisors, in particular human resources manager Shelly Thompson and general manager Brad Myers, would "badger" her, ask her "where you going [sic]," and demand that she "get things done . . . now" and "at that moment." Pl.'s Dep. at 135-37. Myers allegedly sometimes "would throw up a tantrum like a child" when plaintiff requested a break, while Thompson would "get[] angry." *Id.* at 138-41. In light of this testimony, a jury must decide whether defendant actually granted plaintiff's requested accommodation.

Defendant next argues that it is entitled to summary judgment on plaintiff's ADA discrimination claim because plaintiff has failed to state a prima facie case. Here, defendant argues that "Plaintiff's *prima facie* case fails because she cannot identify a similarly-situated non-disabled individual who was treated better than she." Def.'s Summ. J. Br. at 13. But plaintiff need not make such a showing. To state a prima facie case of ADA discrimination based on termination, a plaintiff must show that "1) he was disabled; 2) he was otherwise qualified to perform his job with or without

6

reasonable accommodation; 3) he suffered an adverse employment decision; 4) his employer knew or had reason to know of his disability; and 5) he was replaced or that the position remained open while his employer looked for other applicants." *Cooley v. FedEx Freight, Inc.*, No. 19-1413, 2020 WL 6163476, at *4 (6th Cir. Sept. 11, 2020). Identifying "a similarly-situated non-disabled individual who was treated better than [plaintiff]" is not required.[4]

Defendant next argues that if plaintiff has stated a prima facie case of ADA discrimination based on her termination, the claim nonetheless fails because defendant had a legitimate, nondiscriminatory reason for discharging her (i.e., poor work performance) and plaintiff cannot show that this explanation is pretextual. ADA cases are analyzed under the *McDonnell Douglas* burden-shifting framework when, as here, plaintiff claims she was discharged in violation of her ADA rights and she relies on indirect evidence. *See Hendershott v. St. Luke's Hosp.*, No. 20-3128, 2020 WL 6256869, at *1 (6th Cir. Aug. 25, 2020). Once plaintiff states a prima facie case, the burden shifts to defendant to show that it had a legitimate, nondiscriminatory reason for discharging plaintiff; plaintiff then must show that the suggested reason is a pretext for discrimination. *See id.* at *2.

Defendant's argument goes to the heart of the case: why was plaintiff discharged? Plaintiff's "termination notice" is silent as to the reason, Pl.'s Ex. 11, and plaintiff was given no explanation when she was handed this notice by human resources managers Thompson and Meador.

---

[4] In addition to showing that defendant denied the accommodation, which in this case is disputed, plaintiff states a prima facie case of failure-to-accommodate discrimination by showing "(1) that he is disabled, and (2) that he is otherwise qualified for the position despite his or her disability: . . . or (c) with a proposed reasonable accommodation." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020). Defendant does not argue that plaintiff has failed to state these elements.

*See* Pl.'s Dep. at 186-87. Some evidence supports defendant's stated reason for discharging plaintiff. Myers, the plant's general manager, testified that he decided to discharge plaintiff because she mishandled an incident in which an employee was injured. Myers Dep. at 15-16. Myers, who became general manager about the same time that plaintiff returned from her disability leave at the end of September 2017, did not believe the plant's safety programs were adequate, although he conceded there were no OSHA or MIOSHA violations at the plant in 2017. *Id.* at 14, 17. Myers recounted a time when plaintiff should have been able to address a recent safety incident at a morning meeting, but she "handed the microphone off to someone else, because she couldn't speak to it." *Id.* at 20. He recounted another incident when he asked plaintiff to schedule a safety meeting with him and some of the managers; plaintiff scheduled the meeting but then failed to attend, apparently because she "either went to the wrong room or had the times mixed up." *Id.* at 25. Myers also testified that a safety advisor, Mr. Stolpe, did an informal safety audit of the plant in late 2017. Stolpe "pretty much said we failed the assessment. And he was very concerned of [plaintiff's] capability to . . . lead safety in that division." *Id.* at 30.

On the other hand, there is evidence suggesting that plaintiff's job performance was not lacking. Plaintiff's July 2016 performance review gave her the highest marks in all categories. *See* Pl.'s Ex. 2. The human resources manager, Shelly Thompson, stated that plaintiff "handles multiple projects at one time & delivers error free & on schedule"; that she "has interaction at all levels & continues to build relationships"; and that her decision-making was "very thorough." *Id.* While not among the record evidence, plaintiff's other performance reviews in 2016 were, according to plaintiff, "all very good." Pl.'s Dep. at 183-84. Plaintiff was not given a performance review in 2017. *See id.* at 184. In December 2016, defendant gave plaintiff a cash bonus "in recognition for

8

your extraordinary contributions in 2016" and praised her "commitment and dedication in being part of this small team that is leading the future of Cosma Body Assembly Michigan and its success." Pl.'s Ex. 3.

While poor job performance certainly would be a legitimate, nondiscriminatory reason to discharge any employee, on summary judgment the Court must view the evidence in the light most favorable to plaintiff. A reasonable jury might well be skeptical of defendant's claim that plaintiff was fired for this reason, after it gave her excellent performance reviews and a nearly $2,000 cash bonus just a few months earlier. A reasonable jury might also reject defendant's suggestion that plaintiff was performing so inadequately as to warrant being discharged because she missed a meeting on one occasion and passed the microphone to a more knowledgeable coworker on another. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 777 (6th Cir. 2018) (noting that pretext can be shown "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct"). A reasonable jury might also be suspicious of defendant's explanation, in light of the short period of time that elapsed (less than two months) between plaintiff returning to work with accommodations (which, according to plaintiff, made her supervisors angry) and being discharged. Defendant's motion for summary judgment on this claim must be denied.

Defendant next seeks summary judgment on plaintiff's claim that she was discharged in retaliation for exercising her ADA rights, i.e., for requesting accommodations. Defendant argues that plaintiff failed to exhaust her administrative remedies because she did not include this retaliation claim in the charge she filed with the Equal Employment Opportunity Commission ("EEOC").

The Court rejects this argument. In her EEOC charge, plaintiff stated, in relevant

part:

> Throughout my employment, I, along with other race, Black employees [sic] were harassed. I made an internal complaint but nothing was done. I was diagnosed with my disability while employed at Respondent. I requested a reasonable accommodation which Respondent ignored. I was discharged on November 17, 2017, and was given no reason as to why I was being let go.
>
> I believe I was harassed and discharged because of my race, Black and discharged in retaliation for making a protected complaint, in violation of Title VII of the Civil Rights Act of 1964, as amended. I believe I was discharged and denied a reasonable accommodation based on my disability, in violation of the [ADA].

Def.'s Ex. 14. Plaintiff also checked boxes on this EEOC form to indicate that she based her claim on "race," "retaliation," and "disability." *Id.*

Plaintiff's allegation that she "was discharged and denied a reasonable accommodation based on [her] disability, in violation of the [ADA]," combined with checking the "retaliation" box on the EEOC form, sufficed to assert an ADA retaliation charge. As the Sixth Circuit has stated, "under the scope of investigation test, 'retaliation naturally grows out of any underlying substantive discrimination charge, making a retaliation claim foreseeable to defendants.'" *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380 (6th Cir. 2002) (quoting *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 833 (6th Cir.1999)). Plaintiff's EEOC charge sufficed to "mak[e] a retaliation claim foreseeable to defendant[]." The Court therefore rejects defendant's argument that this claim fails for lack of exhaustion.

Defendant next argues that this claim fails on the merits because "[p]laintiff has no evidence to suggest that her request for a reasonable accommodation and her medical leave had anything to do with her discharge" and because defendant had a legitimate, nondiscriminatory reason to discharge her. The Court rejects these arguments for the reasons stated above.

10

Thompson's and Myers' allegedly angry response to plaintiff's efforts to invoke her requested accommodation is evidence that defendant in fact did not agree with the request and that defendant may have decided to discharge plaintiff in order to be rid of an employee who requested breaks in accordance with the accommodation. Also as noted above, the evidence is disputed as to whether plaintiff was discharged for poor performance. A jury will have to decide whether defendant accommodated plaintiff's disability and whether plaintiff's disability or her request for an accommodation caused defendant to discharge her.

***Title VII and ELCRA Claims***

Defendant next seeks summary judgment on plaintiff's race discrimination and retaliation claims under Title VII and the ELCRA.[5] The allegations in the complaint regarding race discrimination against plaintiff are the following:

> 85. Because of her race, Plaintiff was subjected to treatment during her time with Defendant that was disparate from that accorded to non-minority co-workers of Defendant and at the location of Plaintiff's employment, who were treated more favorably than she was.
>
> * * *
>
> 87. The disparate and less favorable treatment to which Plaintiff was subjected during her employment with Defendant has included adverse employment actions on the basis of Plaintiff's race, or Plaintiff has otherwise been discriminated against with respect to employment, promotional opportunities, compensation or other conditions or privileges of employment on the basis of her race.

Compl. ¶¶ 85, 87. While it is not clear from these allegations, plaintiff's response brief clarifies that

---

[5] The Court's analysis under Title VII applies equally to plaintiff's claims under the ELCRA. As defendant notes, Title VII and ELCRA claims are analyzed under essentially the same standards. *See* Def.'s Summ. J. Br. at 18 n.10.

her race discrimination claim (unlike her retaliation claims) is based solely on her termination. *See* Pl.'s Br. at 27-28.

When the basis of a Title VII claim is termination, a plaintiff states a prima facie case of discrimination "by showing 1) that he was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class." *Chaney v. Haworth, Inc.*, 802 F. App'x 1006, 1012 (6th Cir. 2020) (internal quotation marks and citations omitted). *Accord Nesmith v. Compassus*, No. 18-5691, 2018 WL 6841768, at *2 (6th Cir. Dec. 10, 2018). The same standard applies under the ELCRA. *See Moore v. Huntington Nat'l Bank*, No. 352368, 2021 WL 2179337, at *6 (Mich. Ct. App. May 27, 2021) (citing *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001)).

Plaintiff has failed to state a prima facie case of racially discriminatory termination because she does not allege that she "was replaced by someone outside of the protected class." In fact, the complaint makes no allegation regarding who, if anyone, replaced her. Nor did plaintiff mention anything about her replacement, if indeed she was replaced, at her deposition or in her response brief. As plaintiff has failed to state a prima facie case of racially discriminatory termination, defendant is entitled to summary judgment on this claim.

Plaintiff's retaliation claim, under Title VII and the ELCRA, is based on the following allegations:

> 101. Plaintiff engaged in conduct protected under Title VII, including, but not limited to, complaining of, reporting, and/or opposing the discriminatory conduct of the agents, servants, and/or employees of Defendant.
>
> 102. Defendant had knowledge of Plaintiff's protected activities.
>
> 103. Defendant, . . . subsequently took adverse, retaliatory action

> against Plaintiff including, but not limited to, terminating Plaintiff, denying Plaintiff various employment benefits and denying her other conditions, terms, opportunities, and privileges provided to other, non-engaging in protected activity employees of Defendant.

Compl. ¶¶ 101-103. At her deposition, plaintiff testified that she observed several disturbing instances of race discrimination against African-American employees at defendant's New Hudson plant. For example, plaintiff testified that Brad Myers, the plant's general manager, told her that he wanted to be rid of a particular African-American employee because he was "too urban"; that defendant's human resources manager, Shelly Thompson, wanted one of defendant's employment agencies, Adecco, to stop sending "them people from Detroit"; that some production line leaders complained to human resources representatives about needing to "get those n****** out," referring to certain African-American production line workers; that a production line manager told his workers that they "don't have to do what that N say do," referring to an African-American production area leader, and calling this employee "boy"; and that the human resources office was often locked when African-American employees would come seeking assistance ("lock the door time"), but that the door would be opened for Caucasian employees. Pl.'s Dep. at 130, 147, 149, 168-69, 175-77. Plaintiff testified that she reported these instances of racial discrimination to Thompson, Myers, Meador, and the company hotline. *Id.* at 134, 144-45, 147-52, 156, 169-70, 174-77, and 186.

Defendant acknowledges that Title VII prohibits an employer from taking adverse action against an employee who engages in protected activity. *See* Def.'s Summ. J. Br. at 22. And plaintiff clearly engaged in protected activity by reporting instances of race discrimination she observed being perpetrated against other employees. *See Jackson v. Genesee Cnty. Rd. Comm'n*, No. 20-1334, 2021 WL 2155045, at *6 (6th Cir. May 27, 2021); *Crawford v. Chipotle Mexican*

13

*Grill, Inc.*, 773 F. App'x 822, 828 (6th Cir. 2019). Defendant nonetheless seeks summary judgment on this claim on the grounds that Myers, the general manager at defendant's New Hudson plant who decided to discharge plaintiff, "only learned of Plaintiff's complaints regarding alleged race discrimination *after* Plaintiff's termination." Def.'s Summ. J. Br. at 23 (emphasis in original).

The Court rejects this argument. Plaintiff testified that Myers was among those to whom she reported her observations, and that Myers himself commented to plaintiff that he wanted to fire an African-American employee whom he characterized as "too urban."[6] Moreover, Myers testified that he made the decision to discharge plaintiff in consultation with the human resource manager Charman Meador. *See* Myers Dep. at 31-32. Plaintiff testified that she made her race discrimination complaints to Myers, Meador, and others, including her direct supervisor, human resources manager Shelly Thompson. *See* Pl.'s Dep. at 134 (Meador), 144-45 (Meador, Myers,

---

[6] Plaintiff testified as follows regarding this comment:

> Brad Myers was upset that we had an employee, and it was a recordable [injury incident], and he was upset because there was no paperwork with respect to an investigation. The person who sent him to medical tried to conceal that he sent him to medical, claiming that he had a weld spark penetrated his glove, went through his finger while driving a forklift.
>
> Brad Myers was angry. He said to me that that guy was "too urban," and he wanted him to be released.
>
> And he said to me, that he wanted me – on my word that he wanted me to say that there is no way that the accident could occur at our facility. And if I would say that, he would fire him.
>
> It was then that I told him, "Here we go again. When you use that word 'urban,' it has racial overtones for me."

Pl.'s Dep. at 130-31. This conversation took place in October 2017. *Id.* at 133.

Thompson), 147 (Meador), 148-49 (Thompson), 150 (Myers, Thompson), 169-70 (Meador), 177 (Thompson, Meador, Myers), and 186 (Meador). Therefore, a jury could reasonably conclude that Myers and Meador were aware of her complaints. Meador's awareness is relevant, as Myers testified that she was involved in his decision to discharge plaintiff. *See Howard*, 2013 WL 6730054, at *6 (citing *Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir.1995)). In light of the conflicting evidence, a jury must assess defendant's contention that Myers knew nothing of plaintiff's race discrimination complaints when he decided to discharge her.

Defendant also argues that plaintiff cannot dispute its nonretaliatory reason for discharging her, again reiterating that she was discharged for poor performance. As noted above, the evidence regarding this explanation is disputed. Moreover, the temporal proximity between plaintiff's complaints and her discharge is powerful evidence of retaliation. Plaintiff testified that she spoke to Myers about his "too urban" comment in October 2017, one month before she was discharged. Pl.'s Dep. at 133. Plaintiff also testified that she was discharged just twelve days after having a "lengthy conversation" with Meador about her race discrimination complaints. *Id.* at 145-47. Further, plaintiff testified that during a July or August 2017 conversation, Thompson "was really on me because the black females on the production floor were calling the hotline, and she wanted to know, was it me," to which plaintiff responded, "I called too, yes." *Id.* at 148-49. Plaintiff was discharged the following November. A jury will have to determine whether defendant discharged plaintiff in retaliation for making the race discrimination complaints to which she has testified.

***WDCA Retaliation Claim***

Finally, defendant seeks summary judgment as to plaintiff's claim that defendant

retaliated against her in violation of the Workers' Disability Compensation Act ("WDCA"). Plaintiff's allegations concerning this claim are the following:

> 138. Plaintiff engaged in protected activity when she reported an injury that was subsequently determined to be work-related and sought treatment regarding that workplace injury, and when an inquiry occurred about filing for workers compensation benefits when her accommodation request was denied.
>
> 139. Defendant had knowledge of Plaintiff's protected activities as set forth in the preceding paragraphs.
>
> 140. Shortly after Defendant became aware that Plaintiff's PTSD and related medical issues posed worker's compensation claims, Plaintiff was terminated.
>
> 141. Given this termination, Plaintiff was never provided any opportunity to seek worker's compensation benefits.
>
> 142. Had Plaintiff's medical condition not given rise to potential worker's compensation coverage and/or seeking treatment pursuant to a workplace injury, she would not have been subjected to adverse treatment from Defendant.
>
> 143. Plaintiff had a spotless employment record before any of this occurred regarding her worker's compensation protected activity.
>
> 144. Defendant retaliatorily disregarded its internal policies when it terminated Plaintiff despite her attempts to return to work and/or provide Defendant with necessary documentation regarding her need for an accommodation.

Compl. ¶¶ 138-44. The work-related injury referenced in ¶ 138 is plaintiff's PTSD diagnosis. When defendant sought short-term disability benefits for plaintiff while she was on her month-long leave of absence (from the end of August to the end of September 2017), defendant's insurance carrier denied the claim on the grounds that "the disability is a result of an occupational sickness or injury." Def.'s Ex. 9.

        The Court shall grant summary judgment for defendant on this claim. As plaintiff

concedes, she must show as an element of a prima facie case of WDCA retaliation that she "asserted a right under the Worker's Compensation Act." Pl.'s Br. at 31 (citing *Cuddington v. United Health Servs., Inc.*, 826 N.W.2d 519 (Mich. Ct. App. 2012)).[7] Plaintiff does not allege that she ever "asserted a right to obtain necessary medical services or actually exercised that right" under the WDCA. To the contrary, plaintiff testified at her deposition that she never filed a workers' compensation claim and that it is the employee's responsibility to do so. *See* Pl.'s Dep. at 29, 128. Plaintiff also testified that she never spoke to anyone associated with defendant about filing such a claim. *See id.* at 193. Plaintiff, or defendant on plaintiff's behalf, did submit a claim with defendant's insurance carrier for short-term disability, *see* Pl.'s Ex. 9, but this does show that plaintiff exercised, or attempted to exercise, any right under the WDCA. Accordingly, plaintiff has not stated a prima facie case of retaliation under the WDCA. Defendant is entitled to summary judgment on this claim.

---

[7] Actually, *Cuddington* stated:

> To establish a prima facie case of retaliation under the WDCA, an employee who has suffered a work-related injury must present evidence: (1) that the employee asserted a right to obtain necessary medical services or actually exercised that right, (2) that the employer knew that the employee engaged in this protected conduct, (3) that the employer took an employment action adverse to the employee, and (4) that the adverse employment action and the employee's assertion or exercise of a right afforded under MCL 418.315(1) were causally connected. *See DeFlaviis v. Lord & Taylor, Inc.*, 223 Mich.App. 432, 436, 566 N.W.2d 661 (1997) (noting the elements of a prima facie case of unlawful retaliation that the plaintiff must prove to establish a violation of the CRA).

*Id.* at 525.

17

*Conclusion*

For the reasons stated above, the Court concludes that defendant is entitled to summary judgment on plaintiff's claims of Title VII and ELCRA discrimination and WDCA retaliation, but not on any of plaintiff's other claims. Accordingly,

IT IS ORDERED that defendant's motion for summary judgment is granted in part and denied in part as follows: the motion is granted as to plaintiff's claims for race discrimination under Title VII and the ELCRA (Counts IV and VI) and for WDCA retaliation (Count VIII), but otherwise the motion is denied.

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
Dated: June 30, 2021  SENIOR UNITED STATES DISTRICT JUDGE
Detroit, Michigan